No. 12-31155
(consolidated with No. 13-30095)

———————————

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

———————————

IN RE: DEEPWATER HORIZON – APPEALS OF THE ECONOMIC AND PROPERTY
DAMAGE CLASS ACTION SETTLEMENT

———————————

LAKE EUGENIE LAND & DEVELOPMENT, INCORPORATED; BON SECOUR
FISHERIES, INCORPORATED; FORT MORGAN REALTY, INCORPORATED; LFBP
1, L.L.C. DOING BUSINESS AS GW FINS; PANAMA CITY BEACH DOLPHIN
TOURS & MORE, L.L.C.; ZEKES CHARTER FLEET, L.L.C.; WILLIAM SELLERS;
KATHLEEN IRWIN; RONALD LUNDY; CORLISS GALLO; JOHN TESVICH; MI-
CHAEL GUIDRY, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY
SITUATED; HENRY HUTTO; BRAD FRILOUX; JERRY J. KEE,

*Plaintiffs–Appellees*,

*v.*

BP EXPLORATION & PRODUCTION INCORPORATED,
BP AMERICA PRODUCTION COMPANY, AND BP P.L.C.,

*Defendants–Appellees*,

*v.*

GULF ORGANIZED FISHERIES IN SOLIDARITY & HOPE, INCORPORATED,

*Movant–Appellant.*

———————————

On Appeal from the United States District Court
for the Eastern District of Louisiana
MDL No. 2179, Civ. A. No. 12-970

———————————

# BRIEF FOR APPELLEES BP EXPLORATION & PRODUCTION
# INC., BP AMERICA PRODUCTION CO., AND BP P.L.C.

———————————

[*counsel listed on inside cover*]

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Wendy L. Bloom
Andrew B. Bloomer, P.C.
R. Chris Heck
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL  60654
(312) 862-2000

Jeffrey Bossert Clark
Steven A. Myers
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C.  20005
(202) 879-5000

S. Gene Fendler
Don K. Haycraft
R. Keith Jarrett
LISKOW & LEWIS
701 Poydras Street
Suite 5000
New Orleans, LA  70139
(504) 581-7979

Theodore B. Olson
  *Counsel of Record*
Miguel A. Estrada
Thomas G. Hungar
Scott P. Martin
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500

George H. Brown
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA  94304
(650) 849-5300

Daniel A. Cantor
Andrew T. Karron
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C.  20004
(202) 942-5000

Jeffrey Lennard
DENTONS LLP
233 South Wacker Drive
Suite 7800
Chicago, IL  60606
(312) 876-8000

*Counsel for Defendants-Appellees*

## CERTIFICATE OF INTERESTED PERSONS

No. 12-31155
(consolidated with No. 13-30095)

IN RE: DEEPWATER HORIZON – APPEALS OF THE ECONOMIC AND PROPERTY
DAMAGE CLASS ACTION SETTLEMENT

––––––––––––––––––––––––

LAKE EUGENIE LAND & DEVELOPMENT, INCORPORATED; BON SECOUR
FISHERIES, INCORPORATED; FORT MORGAN REALTY, INCORPORATED; LFBP
1, L.L.C. DOING BUSINESS AS GW FINS; PANAMA CITY BEACH DOLPHIN
TOURS & MORE, L.L.C.; ZEKES CHARTER FLEET, L.L.C.; WILLIAM SELLERS;
KATHLEEN IRWIN; RONALD LUNDY; CORLISS GALLO; JOHN TESVICH; MI-
CHAEL GUIDRY, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY
SITUATED; HENRY HUTTO; BRAD FRILOUX; JERRY J. KEE,

*Plaintiffs–Appellees*,

*v.*

BP EXPLORATION & PRODUCTION INCORPORATED,
BP AMERICA PRODUCTION COMPANY, AND BP P.L.C.,

*Defendants–Appellees*,

*v.*

GULF ORGANIZED FISHERIES IN SOLIDARITY & HOPE, INCORPORATED,
*Movant–Appellant*.

The undersigned counsel of record certifies that the following in-
terested persons and entities described in the fourth sentence of Rule
28.2.1 have an interest in the outcome of this case. These representa-
tions are made in order that the judges of this Court may evaluate pos-
sible disqualification or recusal.

## A.    Plaintiffs–Appellees

This action (the *"Bon Secour"* action) is brought by fifteen class representatives:  Lake Eugenie Land & Development, Inc.; Bon Secour Fisheries, Inc.; Fort Morgan Realty, Inc.; LFBP #1, LLC d/b/a GW Fins; Panama City Beach Dolphin Tours & More, LLC; Zeke's Charter Fleet, LLC; William Sellers; Kathleen Irwin; Ronald Lundy; Corliss Gallo; John Tesvich; Michael Guidry; Henry Hutto; Brad Friloux; and Jerry J. Kee.

The class representatives represent the Economic and Property Damages Class that the district court certified, for settlement purposes only, on December 21, 2012.  *See* Record on Appeal No. 13-30095 ("R.") 19971.  The absent class members together comprise a "large group of persons [who] can be specified by a generic description, [such that] individual listing is not necessary."  5th Cir. R. 28.2.1.

## B.    Attorneys for Plaintiffs–Appellees

Stephen Jay Herman
Soren E. Gisleson
HERMAN HERMAN & KATZ LLP
820 O'Keefe Avenue
New Orleans, LA  70113

James Parkerson Roy
DOMENGEAUX, WRIGHT, ROY & EDWARDS
Suite 500
556 Jefferson Street
Lafayette, LA  70501

Elizabeth Joan Cabraser
LIEFF, CABRASER, HEIMANN & BERNSTEIN
29th Floor
275 Battery Street
San Francisco, CA  94111

Samuel Issacharoff
NEW YORK UNIVERSITY SCHOOL OF LAW
40 Washington Square, S., Suite 411J
New York, NY  10012

**C.**     **Defendants–Appellees**

BP Exploration & Production Inc.
BP America Production Company
BP p.l.c.

**D.**     **Attorneys for Defendants–Appellees**

Theodore B. Olson
Miguel A. Estrada
Thomas G. Hungar
Scott P. Martin
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036

George H. Brown
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA  94304

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Wendy L. Bloom
Andrew B. Bloomer, P.C.
R. Chris Heck
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL  60654

Jeffrey Bossert Clark
Steven A. Myers
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C.  20005

S. Gene Fendler
Don K. Haycraft
R. Keith Jarrett
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, LA  70139

Robert C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C.  20004

Daniel A. Cantor
Andrew T. Karron
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C.  20004

Jeffrey Lennard
Keith Moskowitz
DENTONS LLP
233 South Wacker Drive
Suite 7800
Chicago, IL  60606

James J. Neath
Mark Holstein
BP AMERICA INC.
501 Westlake Park Boulevard
Houston, TX  77079

## E.    Movant–Appellant

Gulf Organized Fisheries in Solidarity & Hope, Inc., or "GO FISH," is a non-profit coalition of Gulf seafood industry groups. GO FISH does not have a parent corporation and no publicly held corporation owns 10% or more of its stock.  Its voting members are: Louisiana Shrimp Association; Louisiana Bayoukeeper; Southeast Asian Fisherfolk Association; Association of Family Fishermen; Louisiana Oysterman Association; Pointe-Au-Chien Indian Tribe; and United Commercial Fishermen's Association.  The non-voting partner members are: Catholic Charities Archdiocese of New Orleans; Greater New Orleans Disaster Recovery Partnership; and Mary Queen of Viet Nam Community Development Corporation.  The commercial fishermen who are members of the organizations and associations comprising GO FISH number in the thousands; each has an interest in the outcome of the litigation and together constitute a "large group of persons [who] can be

specified by a generic description, [such that] individual listing is not necessary." 5th Cir. R. 28.2.1. Thien Nguyen and Donald Dardar are members of GO FISH who have joined this appeal as individuals.

## F.  Attorney for Movant–Appellants

George Frazier
6122 Clara Street
New Orleans, LA 70118

## G.  Plaintiffs–Appellants

The Economic and Property Damages Class that the district court certified, for settlement purposes only, on December 21, 2012, Record on Appeal No. 13-30095 ("R.") 19971, included numerous objectors identified at R.11718-900. The absent class member objectors together comprise a "large group of persons [who] can be specified by a generic description, [such that] individual listing is not necessary." 5th Cir. R. 28.2.1.

## H.  Attorneys for Plaintiffs–Appellants

Joseph Darrell Palmer
LAW OFFICES OF JOSEPH DARRELL PALMER
Suite A
603 N. Highway 101
Solana Beach, CA 92075-0000

John Jacob Pentz III
LAW OFFICE OF JOHN J. PENTZ
19 Widow Rites Lane
Sudbury, MA 01776-0000
Stuart Cooper Yoes

vi

YOES LAW FIRM, L.L.P.
Suite 235
3535 Calder Avenue
Beaumont, TX  7706-0000

Brent Wayne Coon
BRENT COON & ASSOCIATES
215 Orleans
Beaumont, TX  77701

Wesley J. Farrell
FARRELL & PATEL
1425 Brickell Avenue, Suite 58C
Miami, FL  33131

Terry Gray
FARRELL & PATEL, ATTORNEYS AT LAW
113 Almeria Avenue
Coral Gables, FL  33134

Sarah Elise Spigener
FARRELL & PATEL
Suite 1400
1515 Poydras Street
New Orleans, LA  70112

Stanley Paul Baudin
PENDLEY, BAUDIN & COFFIN, L.L.P.
24110 Eden Street
Plaquemine, LA  70764-0071

N. Albert Bacharach, Jr.
115 N.E. 6th Avenue
Gainesville, FL  32601-0000

Kevin W. Grillo
PENA & GRILLO, P.L.L.C.
1240 3rd Street
Corpus Christi, TX  78404-0000

   /s/ Theodore B. Olson
_____
Theodore B. Olson
*Attorney of Record for BP Exploration*
*& Production Inc., BP America*
*Production Company, and BP p.l.c.*

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Fifth Circuit Rule 28.2.3, BP Exploration & Production Inc., BP America Production Company, and BP p.l.c. respectfully submit that oral argument will assist the Court in resolving the important issues presented by these consolidated appeals.  BP's motion seeking expedited oral argument remains pending, and BP renews its request for oral argument to be held on an expedited basis given the irreparable harm that the district court's misinterpretation of the settlement agreement continues to impose on BP.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS .......................................... i

STATEMENT REGARDING ORAL ARGUMENT ................................. ix

TABLE OF CONTENTS ............................................................... x

TABLE OF AUTHORITIES ....................................................... xiii

INTRODUCTION ....................................................................... 1

STATEMENT OF JURISDICTION .............................................. 3

COUNTERSTATEMENT OF ISSUES PRESENTED FOR
    REVIEW ............................................................................ 4

STATEMENT OF FACTS ........................................................... 5

      A.    The Terms Of The Settlement Agreement ................... 8

      B.    Notice To Class Members .............................................. 9

      C.    Class Certification And Final Settlement
            Approval ...................................................................... 10

      D.    Class Counsel And The District Court Distort The
            Settlement Agreement Through An Erroneous
            And Indefensible Variable-Profit Interpretation ....... 13

STANDARD OF REVIEW ........................................................ 22

SUMMARY OF ARGUMENT ................................................... 22

ARGUMENT ......................................................................... 27

    I.    Properly Interpreted, The Settlement Agreement Was
       Fair, Reasonable, And Adequate In Compliance With
       Federal Rule Of Civil Procedure 23(e). ................................. 27

# TABLE OF CONTENTS
## (continued)

**Page**

    A.    The Settlement Agreement Fairly Treats Texas Class Members. ........................................................... 28

    B.    Comparisons Of The Settlement Agreement To The GCCF Are Legally Irrelevant. ............................. 30

    C.    The Gulf Coast Tourism And Gulf Seafood Fund Is Not An Impermissible *Cy Pres* Distribution........... 32

II.    If The Variable-Profit Decision Were Upheld, The Class Could Not Be Certified And The Settlement Could Not Be Approved. ....................................... 34

    A.    The Variable-Profit Decision Renders The Named Plaintiffs Inadequate Class Representatives. ............ 37

    B.    The Variable-Profit Decision Destroys Commonality. ............................................................... 41

    C.    Under The Variable-Profit Decision, Individual Damages Issues Would Predominate Over Any Common Issues. ........................................................... 43

    D.    Under The Variable-Profit Decision, A Class Action Is Not A Superior Means Of Resolving The Disputes Arising From The *Deepwater Horizon* Incident........................................................................ 50

    E.    Under The Variable-Profit Decision, The Class Definition Is Irrational And Therefore Inadequate. ................................................................... 51

    F.    Under The Variable-Profit Decision, The Settlement Is Not Fair, Reasonable, And Adequate........................................................................ 53

# TABLE OF CONTENTS
## (continued)

**Page**

G.   Principles Of Constitutional Avoidance Support
The Conclusion That The Variable-Profit Decision
Renders The Class Uncertifiable. ...............................56

H.   If Upheld, The Variable-Profit Decision Would
Render The Class Notice Misleading And
Impermissible.............................................................58

CONCLUSION ........................................................................60

# TABLE OF AUTHORITIES

**<u>Cases</u>**                                                                           **<u>Page(s)</u>**

*Allison* v. *Citgo Petroleum Corp.*,
    151 F.3d 402 (5th Cir. 1998) .................................................................. 51

*Amchem Prods., Inc.* v. *Windsor*,
    521 U.S. 591 (1997) ................................................................... *passim*

*Banda* v. *Corzine*,
    No. 07-4508, 2007 WL 3243917 (D.N.J. Nov. 1, 2007) ........................ 43

*Bell Atlantic Corp.* v. *AT&T Corp.*,
    339 F.3d 294 (5th Cir. 2003) ..................................................... *passim*

*Berger* v. *Compaq Computer Corp.*,
    257 F.3d 475 (5th Cir. 2001) .................................................................. 38

*Boca Raton Cmty. Hosp., Inc.* v. *Tenet Healthcare Corp.*,
    238 F.R.D. 679 (S.D. Fla. 2006), *aff'd on other grounds by*
    582 F.3d 1227 (11th Cir. 2009) ........................................................ 51, 52

*Comcast Corp.* v. *Behrend*,
    133 S. Ct. 1426 (2013) ............................................................... *passim*

*Davis* v. *Hutchins*,
    321 F.3d 641 (7th Cir. 2003) .................................................................. 34

*Denney* v. *Deutsche Bank AG*,
    443 F.3d 253 (2d Cir. 2006) .................................................................. 56

*Dennis* v. *Kellogg Co.*,
    697 F.3d 858 (9th Cir. 2012) .................................................................. 33

*Dewey* v. *Volkswagen Aktiengesellschaft*,
    681 F.3d 170 (3d Cir. 2012) ............................................................ 38, 40

*Forbush* v. *J.C. Penney Co.*,
    994 F.2d 1101 (5th Cir. 1993) ............................................................... 42

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Gen. Tel. Co. of Sw.* v. *Falcon*,
  457 U.S. 147 (1982) ........................................................................42, 43

*Halvorson* v. *Auto-Owners Ins. Co.*,
  718 F.3d 773 (8th Cir. 2013) ...............................................................56

*Hannah* v. *United States*,
  523 F.3d 597 (5th Cir. 2008) ...............................................................28

*In re Agent Orange Product Liability Litig.*,
  818 F.2d 179 (2d Cir. 1987) .................................................................33

*In re BankAmerica Corp. Sec. Litig.*,
  210 F.R.D. 694 (E.D. Mo. 2002) ..........................................................53

*In re Katrina Canal Breaches Litig.*,
  628 F.3d 185 (5th Cir. 2010) ..........................................................30, 31

*In re Nissan Motor Corp. Antitrust Litig.*,
  552 F.2d 1088 (5th Cir. 1977) ..............................................................59

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent
  Actions*,
  148 F.3d 283 (3d Cir. 1998) .................................................................53

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  No. 12-7085, 2013 WL 4038561 (D.C. Cir. Aug. 9, 2013) ..............45, 49

*Johnson* v. *Gen. Motors Corp.*,
  598 F.2d 432 (5th Cir. 1979) ...............................................................60

*Klier* v. *Elf Atochem N. Am., Inc.*,
  658 F.3d 468 (5th Cir. 2011) ..........................................................32, 33

*Lujan* v. *Defenders of Wildlife*,
  504 U.S. 555 (1992) .........................................................................56, 57

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*M.D. ex rel. Stukenberg* v. *Perry*,
  675 F.3d 832 (5th Cir. 2012) .................................................. 42

*McManus* v. *Fleetwood Enters., Inc.*,
  320 F.3d 545 (5th Cir. 2003) ................................................ 34

*Mims* v. *Stewart Title Guar. Co.*,
  590 F.3d 298 (5th Cir. 2009) .......................................... 22, 57

*Piambino* v. *Bailey*,
  610 F.2d 1306 (5th Cir. 1980) .............................................. 53

*Reed* v. *Gen. Motors Corp.*,
  703 F.2d 170 (5th Cir. 1983) ....................................... *passim*

*Steering Committee* v. *Exxon Mobil Corp.*,
  461 F.3d 598 (5th Cir. 2006) ....................... 35, 44, 48, 50, 51

*Strong* v. *BellSouth Telecomms., Inc.*,
  137 F.3d 844 (5th Cir. 1998) .......................................... 2, 34

*Union Asset Mgmt. Holding A.G.* v. *Dell, Inc.*,
  669 F.3d 632 (5th Cir. 2012) .................................... 22, 51, 52

*Wal-Mart Stores, Inc.* v. *Dukes*,
  131 S. Ct. 2541 (2011) ...................................... 34, 41, 42, 43

*Wilson* v. *Sw. Airlines, Inc.*,
  880 F.2d 807 (5th Cir. 1989) .............................................. 53

*Yokoyama* v. *Midland Nat'l Life Ins. Co.*,
  594 F.3d 1087 (9th Cir. 2010) ............................................ 44

## Statutes

28 U.S.C. § 1291 ...................................................................... 4

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

28 U.S.C. § 1333........................................................................3

28 U.S.C. § 1407........................................................................6

33 U.S.C. § 2702......................................................................49

33 U.S.C. § 2704....................................................................5, 31

33 U.S.C. § 2717........................................................................4

46 U.S.C. § 30101......................................................................4

## Rule

Fed. R. Civ. P. 23 ................................................................*passim*

## Other Authorities

3 Alba Conte *et al.*, *Newberg on Class Actions* (4th ed. 2002)................58

Clyde P. Stickney & Paul R. Brown, *Financial Reporting and
    Statement Analysis: A Strategic Perspective* (4th ed. 1999)................16

Financial Accounting Standards Board, *Statement of Financial
    Accounting Concepts No. 6: Elements of Financial
    Statements* (1985)...........................................................16, 17

Independent Evaluation of the Gulf Coast Claims Facility
    (BDO Consulting, June 5, 2012)............................................6

## INTRODUCTION

These appeals arise from the settlement agreement between BP Exploration & Production Inc., BP America Production Company, and BP p.l.c. (collectively, "BP") and a class including many thousands of businesses and individuals in the region surrounding the Gulf of Mexico. The agreement was established to compensate parties that suffered actual economic and property damages as a result of the *Deepwater Horizon* oil spill in April 2010. In its briefing below, BP did not object to class certification but largely left to class counsel the task of attempting to justify certification of the class under Federal Rule of Civil Procedure 23(a) and (b), and supported the agreement as a fair, reasonable, and adequate approach to resolving the class members' claims under Rule 23(e)(2).

Several objectors seek to challenge the agreement in this Court. Although a number of their contentions are obviously meritless, they have also advanced very substantial arguments—which BP did not brief in any detail below—that the class cannot be certified consistent with Rule 23(a) and (b). These include arguments based on *Comcast Corp.* v. *Behrend*, 133 S. Ct. 1426 (2013), which was decided *after* the certification decision on appeal here and makes clear that certification of a damages class under Rule 23(b)(3) is inappropriate where damages are not capable of classwide proof using a common methodology. This Court has an independent obligation to address these issues, regardless of the

positions asserted by the parties. *See Strong* v. *BellSouth Telecomms., Inc.*, 137 F.3d 844, 849 (5th Cir. 1998).

But regardless of whether the settlement class could properly be certified based on the agreement as written and represented to the district court, the landscape has now significantly changed. At class counsel's urging, the district court has adopted an interpretation of the settlement agreement that drastically and improperly expands the definition of the class. Departing from the agreement's text and purpose, class counsel has argued, and the district court has agreed, that the Claims Administrator must award substantial sums of money to businesses with no losses at all, and pay inflated awards to businesses whose actual lost profits are much smaller. Under the district court's approach, the Claims Administrator determines a claimant's monthly "revenue" and "corresponding . . . expenses"—key terms used in the settlement agreement to assess lost profits for Business Economic Loss ("BEL") claims—in a given period based simply on whatever data the claimant happens to have recorded each month in its bookkeeping systems, even if those data bear no relationship to actual profit measured according to widely accepted methodologies and definitions.

Class counsel's decision to break faith with the core bargain reflected in the BEL provisions of the settlement—namely, a deal to compensate businesses only for actual lost profits suffered by them—and the district court's validation of that breach have produced an interpre-

tation of the settlement that is fatal to class certification here. That interpretation creates an irreconcilable conflict among members of the class, which now includes both injured claimants seeking recovery for actual losses and uninjured businesses seeking utterly unjustifiable windfalls. It destroys commonality and typicality because the class members no longer share the same theory of injury—and, indeed, many class members have no injury at all. It precludes any finding of predominance and superiority, because an approach that awards fictitious and inflated losses is not a reasonable classwide method for assessing damages. It makes the BEL settlement provisions fatally inequitable, because similarly situated claimants receive dramatically different treatment based on irrelevant factors. It renders the class definition arbitrary and irrational, as class membership now turns in large measure on how a particular claimant maintained its books. And it renders the class notice misleading and impermissible, because the notice nowhere disclosed that uninjured claimants could become members of the class depending on the fortuity of their choice of bookkeeping methods. For all of these reasons, the class certification order, and thus the settlement as currently misinterpreted by class counsel and the district court, cannot stand.

## STATEMENT OF JURISDICTION

The district court has jurisdiction over the admiralty and maritime action brought by the plaintiffs against BP pursuant to 28 U.S.C.

§ 1333, 33 U.S.C. § 2717(b), and 46 U.S.C. § 30101. *See* Record on Appeal No. 13-30095 ("R.") 5875 ¶¶ 27-30. On October 25, 2012, the district court affirmed an order entered by the magistrate judge denying a motion to intervene filed by Gulf Organized Fisheries In Solidarity & Hope, Inc. ("GO FISH"), a coalition of fishing industry groups. *See* R.15456. GO FISH appealed from that order on November 12, 2012, *see* R.15666, and its appeal was docketed in this Court as No. 12-31155. While GO FISH's appeal was pending, the district court issued an order on December 21, 2012 certifying a settlement class and approving the class settlement agreement. *See* R.19971. Eight groups of objectors timely filed notices of appeal, including GO FISH. *See* R.20047, 20049, 20052, 20321, 20362, 20364, 20365, 20372. Those notices of appeal were consolidated by the Court under No. 13-30095. On March 6, 2013, the Court granted BP's motion to consolidate Nos. 12-31155 and 13-30095. Several of the objectors' appeals have been dismissed. This Court has jurisdiction over the remaining appeals pursuant to 28 U.S.C. § 1291.

## COUNTERSTATEMENT OF ISSUES PRESENTED FOR REVIEW

1.    Whether the settlement agreement, as written, adopted, and presented to the district court for approval, satisfies the fairness, reasonableness, and adequacy requirements of Federal Rule of Civil Procedure 23(e)(2).

2.    Whether the district court's interpretation of the settlement to permit claims by individuals and businesses that suffered no losses, and to permit inflated claims by other individuals and businesses, defeats class certification under Rule 23.

## STATEMENT OF FACTS

On April 20, 2010, an explosion on the Transocean drilling rig *Deepwater Horizon* caused a substantial oil spill into the Gulf of Mexico. R.19846.  Working with numerous government agencies and private entities, BP immediately initiated a massive response to the incident. This effort ultimately involved as many as 90,000 response workers and 6,500 vessels.  The response included all recognized measures of addressing an oil spill at sea, including (1) skimming oil from the surface; (2) conducting approximately 400 controlled *in situ* burns; (3) placing more than 13 million feet of containment and sorbent boom; and (4) applying approximately 1.8 million gallons of government-approved chemical dispersants to disperse oil and protect the shoreline.  Each aspect of the response was directed and authorized by the federal government.

In addition, as an expression of its corporate culture and its desire to promptly compensate injured parties, BP waived its statutory limit of liability and committed to "pay all legitimate claims," even those far beyond the $75 million liability cap under the Oil Pollution Act, 33 U.S.C. § 2704(a)(3).  R.7296.  Starting within a few days of the spill, BP im-

plemented a claims processing system, and paid out nearly $400 million to individuals and businesses for harms caused by the spill. *Ibid.*  Under this voluntary system, which lasted until August 2010, BP set up 35 field offices in the Gulf States and made over 127,000 payments to more than 30,000 claimants. *See* Independent Evaluation of the Gulf Coast Claims Facility (BDO Consulting, June 5, 2012), at 12, *available at* http://www.justice.gov/iso/opa/resources/66520126611210351178.pdf (last visited August 28, 2013).

BP then created and funded the Gulf Coast Claims Facility ("GCCF"), which paid out over $6.3 billion to individuals and businesses for their claimed spill-related losses over the next year and a half. R.7296-97.  The GCCF, which BP established after consultations with President Obama and the Justice Department, averaged $27 million a day in emergency advance payments in its second full month of operation and received praise from an independent evaluation commissioned by the Department of Justice for responding "with urgency to the economic difficulties of those most likely affected by the Spill."  Independent Evaluation of the Gulf Coast Claims Facility (BDO Consulting, June 15, 2012), Ex. B: *Executive Summary*, at 1-12.

While the GCCF was paying out legitimate claims, plaintiffs' attorneys filed hundreds of lawsuits relating to the oil spill and thousands more joined the litigation through a short-form joinder process.  Pursuant to 28 U.S.C. § 1407, the Judicial Panel on Multidistrict Litigation

consolidated these lawsuits into MDL 2179 in the Eastern District of Louisiana. *See* R.1057. The Plaintiffs' Steering Committee—which later became class counsel (hereinafter, collectively "Class Counsel")—filed multiple iterations of a class action complaint, the most recent of which asserts a class comprising persons and entities located within specified geographical boundaries and whose claims fall within various damages categories, such as claims alleging "[l]oss of income, earnings or profits suffered . . . as a result of the Deepwater Horizon Incident." R. 5953-54, 5956.

In April 2012, the parties presented the district court with a joint motion for preliminary approval of a settlement agreement designed to resolve the class claims. *See* R.3554. Class Counsel separately moved for preliminary and conditional class certification, *see* R.3908, and BP filed a conditional non-opposition to that motion, *see* R.5086. The district court preliminarily and conditionally certified the class solely for purposes of settlement and preliminarily approved the settlement agreement. *See* R.6208. BP agreed to start paying claims under the settlement agreement even before the district court's final approval of that agreement. R.19851. Thus, on June 4, 2012, the *Deepwater Horizon* Court Supervised Settlement Program ("CSSP") commenced operations. R.19853.

## A.    The Terms Of The Settlement Agreement

The settlement agreement defines a single class of individuals and businesses that suffered losses as a result of the *Deepwater Horizon* spill, but contains six frameworks under which class members may file claims:  (1) Economic Damage Compensation (including Individual Economic Loss and Business Economic Loss); (2) Property Damage; (3) Vessels of Opportunity Charter Payment; (4) Vessel Physical Damage; (5) Subsistence Damage; and (6) the Seafood Compensation Program. *See generally* Agreement §§ 5.2-5.9 (R.6292-97).  Within each of these broad categories, there are numerous subcategories and intricate compensation tests.  *See* R.19876.  The agreement creates, for example, four geographic economic loss zones.  *See* Agreement Ex. 1B and 4B (R.6403, 6456).  Subject to a few exceptions, businesses in Zone A—closest to the spill—are not required to provide any evidence of causation.  Agreement Ex. 4B, at 1 (R.6457).  Certain businesses in Zones B, C, and D are also entitled to that presumption, but all other businesses in those zones must provide evidence of causation.  Agreement Ex. 4B, at 1-10 (R.6457-66).

In addition to baseline compensation, claimants in most of the frameworks receive Risk Transfer Premium ("RTP") payments. R.19876.  As the district court explained, "RTP compensates class members for potential future loss, as well as pre-judgment interest, any risk of oil returning, any claims for consequential damages, inconvenience,

aggravation, the lost value of money, compensation for emotional distress, liquidation of legal disputes about punitive damages, and other factors." R.19853. Put another way, the RTP multipliers pay many class members based upon factors *beyond mere compensatory damages*, including to liquidate legal disputes about punitive-damages claims and other forms of non-compensatory recovery. BP also agreed to fund the Gulf Coast Tourism and Gulf Seafood Fund, devoting $57 million to promoting tourism and seafood industries in the Gulf region by funding non-profit and governmental entities engaged in such promotion. R.19954. With the exception of the Seafood Compensation Program, which is capped at $2.3 billion, the settlement does not limit BP's overall liability. R.19877.

The settlement agreement provides that "[t]he Parties agree to support the final approval and implementation of this Agreement and defend it against objections, appeal, or collateral attack." Agreement § 17.1 (R.6344).

### B.    Notice To Class Members

In its preliminary approval order, the district court approved a class notice plan proposed by the parties. R.6243 ¶ 29. Pursuant to that plan, known or potential class members were notified by postal mail and e-mail, and notifications appeared in local newspapers, on radio and television, in consumer magazines, a national business newspaper, trade, business, and specialty publications, and publications fo-

cused on the interests of African-American, Vietnamese, and Hispanic communities. R.19916. An informational notice website and toll-free number were also established. R.19917.

The information included in the various forms of notice was intended to satisfy the requirements of Federal Rule of Civil Procedure 23(c)(2)(B) and 23(e)(1). The notice mailed to known or potential class members explained, for example, that "[t]he lawsuit asserts certain economic loss and property damage claims arising out of the 'Deepwater Horizon Incident'" and that "Plaintiffs seek money and other relief for economic and property damage they allege was caused by the Deepwater Horizon Incident." R.3752. The e-mail notice likewise described the composition of the class as "people, businesses, other entities, and properties in the states of Louisiana, Alabama and Mississippi, and certain counties in Texas and Florida, that were *harmed* by the oil spill." R.3773 (emphasis added). After reviewing the form and contents of the notice, the district court determined that it complied with Rule 23. R.6244-45 ¶¶ 30-33.

## C.    Class Certification And Final Settlement Approval

On December 21, 2012, the district court certified the class for settlement purposes and granted final approval of the settlement agreement. R.19971. Class Counsel—the only party that sought class certification—had argued that the proposed settlement class satisfied the requirements of Rule 23(a) and Rule 23(b)(3). *See* R.3908. The district

court agreed, concluding that "the proposed class in this case consists exclusively of individuals and businesses that have already suffered economic loss and property damage," R.19876, and that any "different payment levels reflect the relative value of the different claims," R.19879.

BP's briefing, in contrast, focused on rebutting the objectors' arguments that the settlement agreement itself failed to satisfy Rule 23(e)'s fairness, reasonableness, and adequacy requirements, or was otherwise unlawful. *See generally* R.15060. BP explained that, "[a]s counsel for the party seeking final certification of the Settlement Class, Class Counsel will respond to the objections challenging . . . certifiability," R.15154, although—solely for purposes of settlement—BP "agree[d]" with Class Counsel's submission that the agreement as written and as represented to the district court to obtain its approval "satisfies all the requisites for class certification," R.15084 n.18.

The district court accepted Class Counsel's contention that the agreement, as it was presented to the court, satisfied Rules 23(a) and (b). The court also agreed with BP's arguments under Rule 23(e), determining that the settlement agreement was fair, reasonable, and adequate because, among other things, there is "no evidence whatsoever of any fraud or collusion in the negotiation of the Settlement," R.19902; absent the settlement, "years of litigation would stand between the class and any such recovery," R.19903; and the settlement agreement

"provides compensation to class members that appears sufficient to make each and every class member whole for his, her, or its compensatory losses," R.19905.

The court went on to reject objectors' arguments that the settlement agreement unreasonably treated certain class members more favorably than other members, including in the allocation of the "zones." As the court explained, "[i]t is perfectly fair and reasonable, and indeed common and accepted, for settlement benefits to turn on the strength of class members' claims." R.19932.

The district court rejected objectors' attempt to compare anticipated payments under the settlement agreement with payments under the GCCF; this comparison was not "legally relevant" because "nothing requires the Court to compare the Settlement to a different extra-judicial settlement process that preceded it." R.19954-55.

Finally, the court held that the Gulf Coast Tourism and Gulf Seafood Fund was not a prohibited *cy pres* award because the Fund was "a specific allotment of money . . . demanded by [Class Counsel] and provided by BP." R.19954. The court further explained that "[a]lleged harm[s] to the tourism and Gulf seafood industries"—the very harms the Fund seeks to remedy—"are core components of the claimed damages being compensated by this Settlement." *Ibid.*

**D.    Class Counsel And The District Court Distort The Settlement Agreement Through An Erroneous And Indefensible Variable-Profit Interpretation**

One of the key features of the settlement agreement is compensation for Business Economic Loss, or "BEL," which reimburses businesses for "[l]oss of income, earnings or profits" caused by the *Deepwater Horizon* incident.   Agreement § 1.3.1.2 (R.6268).   The BEL structure provides a "compensation framework for business claimants" that "[c]ompensates [them] for any reduction in profit between the 2010 Compensation Period selected by the claimant and the comparable months of the Benchmark Period."   Agreement Ex. 4C, at 1 (R.6474). The "Compensation Period" is any period of three or more consecutive months, chosen by the claimant, from May through December 2010. *Ibid.*   To determine the Benchmark Period, the claimant may choose (i) 2009, (ii) the average of 2008 and 2009, or (iii) the average of 2007, 2008, and 2009. *Id.* at 1-2 (R.6474-75).

The BEL framework's critical metric is "Variable Profit," which the settlement agreement calculates as follows:

1.    Sum the monthly *revenue* over the period.

2.    Subtract the *corresponding variable expenses* from *revenue* over the same time period.

Agreement Ex. 4C, at 2 (emphases added) (R.6475).   The BEL framework then compensates claimants for the reduction in Variable Profit, if any, "between the 2010 Compensation Period selected by the claimant

13

and the *comparable months* of the Benchmark Period." *Id.* at 1 (R.6474) (emphasis added). The settlement agreement thus adopts a textbook "lost profits" approach—an economic concept that is regularly utilized and well understood by accountants, economists, and the judicial system. Indeed, the district court found, when it approved the agreement, that the BEL framework is "derived from recognized and accepted methodologies applied in evaluating business economic loss claims." R.19855.

Under the settlement agreement, BEL claimants within specified industries are entitled to RTPs of varying amounts, depending on the industry in which the business operates and the geographic zone in which it is located. Tourism and charter fishing businesses receive RTP multiples ranging from 1.25 to 2.5, depending on the applicable zone. Agreement Ex. 15, at 1 (R.7153). Seafood processing businesses receive RTPs ranging from 2.25 to 3.0, depending on the type of seafood processed. *Ibid.* Certain other seafood businesses also receive an RTP of 2.25. *Id.* at 1-2 (R.7153-54). And non-tourism and non-seafood businesses receive RTPs of 0.25 to 1.5, depending on the applicable zone. *Id.* at 2 (R.7154). RTP multipliers *add* to baseline awards such that a hypothetical claim with an RTP of three results in a recovery of four times baseline awards.

Just months after the parties moved for final approval of the settlement agreement, the number of BEL claims increased substantially,

from 414 at the start of October 2012 to 1,558 by early November 2012. R.24771 ¶ 8 (Keith Moskowitz).  BP raised concerns about this dramatic increase and submitted an inquiry to the Claims Administrator regarding his method for approving such claims.  On December 16, 2012, in response to BP's inquiry, Class Counsel urged the Claims Administrator to issue a "formal Policy Statement" providing that, "[w]hen a business keeps its books on a cash basis, revenue is earned during the month of receipt."  R.25153.

On January 15, 2013, the Claims Administrator formally announced his agreement with Class Counsel's interpretation of the BEL framework.  "In performing th[e] calculations" required by the settlement agreement, he stated, he "will typically consider both revenues and expenses in the periods in which those revenues and expenses were *recorded* at the time," and "will not typically re-allocate such revenues or expenses to different periods."  R.25162 (emphasis added).  The Claims Administrator acknowledged that this interpretation will lead to awards for certain industries, such as "attorneys, construction companies [and] farming enterprises," that "appear disproportionate when compared to award amounts for claimants in other industries." R.25159.

BP challenged Class Counsel's and the Claims Administrator's interpretation in the district court.  As BP explained, the interpretation radically departed from the plain meaning and purpose of the settle-

ment agreement.  To understand why, it is important to recognize that businesses use a variety of different methodologies for recording transactions each month, ranging from simply recording cash receipts and disbursements ("cash-basis" accounting) to more complicated approaches.

Critically, however, "revenue" and "expenses" are not equivalent to cash received or disbursed.  *See*, *e.g.*, Accounting Professors *Amicus* Br., No. 13-30315, at 7-13 (5th Cir. May 10, 2013).  Instead, "[r]evenues represent actual or expected cash inflows (or the equivalent) that have occurred or will eventuate as a result of the entity's ongoing major or central operations."  Financial Accounting Standards Board ("FASB"), *Statement of Financial Accounting Concepts No. 6: Elements of Financial Statements* ¶ 79 (1985).  Thus, "[t]he assets increased by revenues may be of various kinds—for example, cash, claims against customers or clients, other goods or services received, or increased value of a product resulting from production."  *Ibid.* (footnote omitted).  For this reason, textbooks and other professional literature embodying well-established accounting principles explain that revenue must not be "confuse[d] with *receipt of funds*, which may occur before, when, or after revenue is recognized."  Clyde P. Stickney & Paul R. Brown, *Financial Reporting and Statement Analysis: A Strategic Perspective* 904 (4th ed. 1999).  The same is true of expenses:  They must "not [be] confuse[d] with *expenditure* or *disbursement*, which may occur before, when, or af-

ter the *firm recognizes* the related expense." *Id.* at 868. Expenses are not the same as expenditures; they include "expected cash outflows" that "will eventuate," and thus expenses can be reflected in assets that "flow out or are used, or . . . liabilities that are incurred." FASB, *Concepts No. 6*, *supra*, ¶ 81.

While entities might choose to use a variety of simplified or expedient accounting methods to maintain their own internal records, it is undisputed that these methods "will not produce reliable measures of earnings, corresponding variable expenses, and variable profit that can be used to compare economic performance in two periods to calculate 'lost profits.'" R.24701 ¶ 21 (Henry H. Fishkind). As one of BP's economics experts explained, the "root" of the problem with "basing compensation on net cash received" is that this measure "might not include all of the revenues and costs attributable to the activity over [a given] period; and net cash received might include some of the revenues or costs attributable to business activity in other periods." R.24937 ¶ 30 (A. Mitchell Polinsky) (emphasis omitted); *see also* R.24613 ¶ 13 (J. Richard Dietrich) (relying on cash flows "lead[s] to distorted measures of economic profit or loss").

Thus, for businesses that keep unadjusted monthly records—which often include attorneys, construction companies, and farms—the Claims Administrator's interpretation of Variable Profit calculates whether, and how much, the business can recover solely based upon the

17

happenstance of when the transactions were recorded, not based upon when the revenue was actually earned or when the expenses were actually incurred.  Similar problems can arise for businesses that keep only informal monthly records, and adjust those records only at year's end. There are any number of reasons, including simple inaccuracies, why the amounts recorded on a claimants' books might not accurately reflect "revenue" or "corresponding . . . expenses," and yet Class Counsel nonetheless persuaded the Claims Administrator to ignore these issues, transforming his team of accountants into data processors rather than true accounting professionals.  Thus, identically situated businesses, with economically identical performance and identical actual losses due to the spill, can receive wildly different compensation based upon how they keep their books and differences in the year-over-year timing of certain transactions.  BP therefore urged the district court to reverse the Claims Administrator's interpretation and instead instruct him to determine what "revenue" was earned during the relevant periods and the associated (*i.e.*, "corresponding") "expenses" incurred to generate that revenue, in compliance with the plain terms of the agreement.

On March 5, 2013, however, the district court adopted Class Counsel's and the Claims Administrator's interpretation.  In this Variable-Profit Decision, the district court concluded that, in calculating BEL awards, the "analysis is to be based on revenue and expenses during the relevant periods," and that "expenses" need not "be 'matched' to

revenues." R.21002. The district court, however, never explained what it understood the words "revenue" and "expenses" to mean; did not refer to the well-understood definitions of contractual terms like "corresponding"; did not consider widely accepted accounting and economics literature that defines "revenue" and "expenses"; and never grappled with its previous determination that the formula used "recognized and accepted methodologies applied in evaluating business economic loss claims." R.19855. Like the Claims Administrator, the district court acknowledged that its interpretation could produce anomalous results. R.21001-03.

Simply put, while the district court's certification of the settlement class rested upon the assumption that "the proposed class in this case consists *exclusively of individuals and businesses that have already suffered economic loss and property damage*," R.19876 (emphasis added), under that court's interpretation of Variable Profit, businesses that have suffered no economic loss or property damage have been transformed into class members, now entitled to recovery.

The Variable-Profit Decision produces profoundly arbitrary and absurd results. Because the settlement agreement permits claimants to select their own "Compensation Period," the Variable-Profit Decision encourages businesses that keep their records on an informal or unadjusted basis to select Compensation Periods to maximize their recovery, even where those businesses suffered absolutely no actual lost profits

and, in fact, achieved record profits during the spill year.  Unsurprising-ly given this possibility of manipulation, more than two-thirds of BEL claims over $75,000 appear to be based upon businesses with fortuitous record-keeping systems, rather than genuine lost profits resulting from the *Deepwater Horizon* incident.  R.25044-45, 25053 ¶¶ 8-10 & tbl. 1. For example, the Claims Administrator has awarded:

- $21 million to a rice mill in Louisiana, approximately 40 miles from the coast, even though that mill earned more revenue in 2010—the year of the spill—than it did in 2007, 2008, or 2009, *see* R.25098;

- $9.7 million to a construction company in northern Ala-bama—200 miles from the coast—that does no business in the Gulf re-gion and experienced better results in 2010 than in its benchmark years, when its variable profit exceeded the benchmark level by 21%, *see* R.25092;

- $3.7 million to a digital printing business in Alabama that earned 14 percent more profit in the post-spill period of 2010 than it did in the same period during the benchmark years, *see* R.25107; and

- $3.3 million to a law office in central Louisiana, even though its profits in the year of the spill exceeded its benchmark profits by 10 percent, *see* R.25102.

These inflated and improper awards already amount to hundreds of millions (if not billions) of dollars.  It is, moreover, no secret that the

Variable-Profit Decision results in awards that bear little or no resemblance to reality.  Indeed, a large cottage industry has developed, available to anyone who wishes to visit the Internet, in which plaintiffs' attorneys (and even freelance accountants) are advertising for businesses that never believed they had suffered any losses to file claims "[i]f the numbers work." R.25209.  The webpage for one law firm describes the example of a bicycle retailer located in Florida that experienced "[a]n increase of over $500k" in revenue between 2009 and 2010, but for which the form nonetheless "w[as] able to file a claim for almost one million dollars." R.25208.  And another firm bragged that a business could qualify for payment despite having "made more money in 2010." R.25210.

BP has appealed the Variable-Profit Decision to this Court, and oral argument was held on July 8, 2013 before Judges Dennis, Clement, and Southwick. *See* No. 13-30315.[1]

---

[1] While BP's appeal has been pending, revelations have surfaced that a senior CSSP counsel—one of the three counsel appointed to assist the Claims Administrator in interpreting the settlement agreement and administering the review of individual claims—was allegedly receiving payments from a law firm that not only represented claimants before the CSSP, but was itself a BEL claimant. *See* D.E. 10761 Ex. 2. The district court has appointed former federal judge and FBI Director Louis Freeh to conduct a wide-ranging investigation that is broadly designed "to ensure the integrity of the program for the bene-

[Footnote continued on next page]

## STANDARD OF REVIEW

The abuse-of-discretion standard governs this Court's review of both the district court's certification of the settlement class and its approval of the settlement. *See*, *e.g.*, *Union Asset Mgmt. Holding A.G.* v. *Dell, Inc.*, 669 F.3d 632, 638 (5th Cir. 2012); *Mims* v. *Stewart Title Guar. Co.*, 590 F.3d 298, 304 (5th Cir. 2009). The Court nonetheless exercises *de novo* review as to whether the district court applied the correct legal standard. *Mims*, 590 F.3d at 304. A district court necessarily abuses its discretion when it "bases its legal analysis on an erroneous understanding of the governing law." *Id.*

## SUMMARY OF ARGUMENT

In the district court, Class Counsel attempted to carry their burden of establishing that the settlement class satisfied Federal Rule of Civil Procedure 23(a) and (b). This initial inquiry into whether the class can properly be certified "demand[s] undiluted, even heightened, attention in the settlement context." *Amchem Prods., Inc.* v. *Windsor*, 521 U.S. 591, 620 (1997). In contrast, BP did not object to class certification but focused on the distinct requirements of Rule 23(e)(2), under

---

[Footnote continued from previous page]

fit of the parties and the public." D.E. 10564, at 2. Judge Freeh's investigation remains ongoing.

which the district court can approve a class settlement only where that settlement is "fair, reasonable, and adequate."

In its briefing below, BP explained that the settlement agreement satisfied the fairness, reasonableness, and adequacy requirements of Rule 23(e)(2). Following approval of the settlement, however, Class Counsel wholly abandoned the basic premise of the settlement agreement—which was to provide compensation only for injured claimants—and successfully persuaded the district court to misinterpret the agreement in a manner that fatally undermines the certifiability of the class. The district court's Variable-Profit Decision creates an irreconcilable class conflict; destroys commonality, predominance, and superiority; and renders the settlement unfair, the class definition irrational, and the class notice inadequate and impermissible. If the Variable-Profit Decision is allowed to stand, the decision certifying the class must be set aside.

I.    As originally written and approved by the district court, the settlement agreement presented substantial questions under Rule 23(a) and (b), but satisfied Rule 23(e)(2)'s requirements. Although the agreement distinguishes among claimants by employing different causation tests and RTPs based on geographic "zones," the district court did not abuse its discretion in concluding that the agreement reasonably selected these zones as a fair approximation of the relief to which each class member is entitled. The district court also did not abuse its dis-

cretion in declining to compare the settlement agreement to the GCCF. Rule 23(e)(2) requires a comparison between the settlement and the outcome that the class members might obtain through litigation, but the GCCF is an extra-judicial process. Finally, the Gulf Coast Tourism and Gulf Seafood Fund created by the agreement is not an impermissible *cy pres* distribution because it is designed to promote the businesses of class members actually harmed by the spill.

II.    The objectors have raised very substantial challenges to the settlement agreement on the ground that the class cannot properly be certified under Rule 23(a) and (b). "Mass accident" cases are far from prototypical exemplars of litigation that justify class certification, and the propriety of certifying the complex agreement at issue here would present a close case for this Court in the best of circumstances, especially after the Supreme Court's recent pronouncement in *Comcast Corp.* v. *Behrend*, 133 S. Ct. 1426 (2013). But however those arguments might be resolved by this Court in light of the agreement as it was originally written by the parties and presented to the district court, Class Counsel has abandoned that agreement and successfully persuaded the district court to interpret the agreement in a manner that precludes certification of the class. The district court's Variable-Profit Decision provides awards even for claimants that were not injured, thus expanding the scope of the class and creating fatal problems for certification.

As an initial matter, the presence of a substantial number of uninjured claimants in the same class as injured parties creates an irreconcilable conflict between class members, thus precluding any finding that the class representatives can adequately represent the absent class members.  If the Variable-Profit Decision were correct, Class Counsel would have obtained a benefit for many uninjured claimants that could only have come at the expense (and by virtue of the bargaining power) of those with a legitimate claim against BP.  The adequacy requirement is designed to avoid such a tradeoff.

The fact that, by virtue of Class Counsel's and the district court's gross distortion of the terms of the agreement that BP negotiated in good faith, many of the claimants who are now entitled to the benefits of class membership are uninjured would preclude any finding of commonality or typicality.  Those requirements ensure that each of the class members suffered the same injury, but that is manifestly not so where some—and, in this case, many—of the class members were not injured at all.  Under the Variable-Profit Decision, there are no questions common to the class that will resolve an issue central to all class members' claims for the simple reason that not all of the class members *have* claims.

The settlement agreement, as misinterpreted in the Variable-Profit Decision, would also fail the predominance and superiority requirements.  The Supreme Court recently made clear in *Comcast* that

certification is inappropriate where individualized questions of damages predominate over any common issues. To avoid this problem, the proponent of certification must provide an adequate method for calculating damages on a classwide basis. But under the Supreme Court's decision in *Comcast*, an approach that compensates the uninjured, and systematically miscalculates compensation even for the injured, is decidedly inadequate to support class certification and impermissibly divorces a claimant's damages from its theory of injury.

The Variable-Profit Decision would also render the class definition irrational, make the class settlement unfair, and raise substantial constitutional concerns. If the Variable-Profit Decision is to be upheld, then Class Counsel extracted from BP hundreds of millions (if not billions) of dollars in payments to parties that suffered no injuries whatsoever, and thus those parties had no basis—or even constitutional standing—to assert any claims against BP. Such a windfall could only have come out of funds that BP would otherwise have been willing to devote to paying those claimants who were actually harmed by the *Deepwater Horizon* incident. To be clear, BP vigorously disputes that the Variable-Profit Decision was correct; but if the Decision were to be upheld, then the settlement would be rendered wholly unfair, irrational, and constitutionally suspect.

Finally, under the Variable-Profit Decision, the class notice would be misleading and inadequate. That notice defined the economic-loss

class as including those who were harmed by the *Deepwater Horizon* oil spill. The class members had no way to know from the notice that the class would *also* include those who had not been injured by the spill.

For each of these reasons, the class certification order—and, thus, the settlement approval itself—would have to be reversed if the Variable-Profit Decision were allowed to stand.

## ARGUMENT

### I. Properly Interpreted, The Settlement Agreement Was Fair, Reasonable, And Adequate In Compliance With Federal Rule Of Civil Procedure 23(e).

From the moment of the *Deepwater Horizon* spill, BP has endeavored to provide expeditious compensation for injured parties even absent compulsion through legal process. Indeed, BP provided a model of corporate citizenship by looking for ways to make whole those harmed as a result of this accident. In this respect, BP's behavior stands in stark contrast to other corporate parties that have played a role in environmental tragedies and responded with trench warfare and decades of litigation. After voluntarily paying multiple billions of dollars in claims through other facilities, BP's unflagging commitment to the Gulf region culminated in a settlement agreement that was designed and intended to provide full compensation to those actually injured by the spill.

The district court upheld this settlement under Rule 23(e)(2), concluding that there is "no evidence whatsoever of any fraud or collusion

in the negotiation of the Settlement," R.19902; that, absent the settlement, "years of litigation would stand between the class and any such recovery," R.19903; and that "the settlement agreement provides compensation to class members that appears sufficient to make each and every class member whole for his, her, or its compensatory losses," R.19905.  The district court further explained that "[i]t is perfectly fair and reasonable, and indeed common and accepted, for settlement benefits to turn on the strength of class members' claims."  R.19932.  On appeal, the objectors do not challenge the bulk of the district court's Rule 23(e)(2) findings and thus have waived any challenges to them.  *See Hannah* v. *United States*, 523 F.3d 597, 600 n.1 (5th Cir. 2008).  And leaving aside the Rule 23(a) and (b) issues and the fatal consequences of the Variable-Profit Decision (which renders the agreement inequitable and arbitrary), the few arguments that the objectors raise against the settlement's fairness, reasonableness, and adequacy—namely, that the agreement unfairly treats Texas class members, that it is disadvantageous compared to the GCCF, and that it involves an impermissible *cy pres* distribution—are meritless.

### A.    The Settlement Agreement Fairly Treats Texas Class Members.

A settlement agreement is fair, reasonable, and adequate under Rule 23(e) if it provides a recovery to class members that is a "fair approximation of [their] relative entitlement."  *Reed* v. *Gen. Motors Corp.*,

703 F.2d 170, 175 (5th Cir. 1983). Objectors led by Cobb Real Estate, Inc. ("Cobb Objectors") argue that the settlement agreement is unfair because Texas claimants must submit documentation to establish that their injuries were caused by the oil spill and because they are not eligible for the presumption of causation that certain Louisiana claimants receive. But while Texas class members are "treated differently" from certain Louisiana class members in this respect, Cobb Br. 8-9, that does not undermine the validity of the agreement as written and presented to the district court for its approval.

The settlement agreement establishes four economic loss "zones," which, among other things, act to excuse certain class members from proving causation or lowers their burden for doing so. Agreement Ex. 4B, at 1 (R.6457). These zones are based upon the principle that class members with closer proximity to the oil spill are more likely to have had their injuries caused by the spill. As the district court explained, "the zones were established using thorough and comprehensive data." R.19942.

Even if the boundary lines between the zones do not perfectly reflect the most appropriate division for *every* claimant—such as some entities in Texas that the Cobb Objectors identify—the district court did not abuse its discretion in concluding that the zones, taken as a whole, will lead to a "fair approximation" of the relief to which each class member is entitled. *Reed*, 703 F.2d at 175. The careful analysis that

went into crafting and defining the zones is easily distinguishable from the one case cited by the Cobb Objectors, in which the settlement agreement provided "no method" to distinguish how class members "suffer[ing] a wide variety of injuries" would be "treated vis-á-vis each other." *In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 193-94 (5th Cir. 2010). And it is similarly distinguishable from the arbitrary and inequitable differences in treatment among class members' claims introduced by the district court's erroneous Variable-Profit Decision. *See infra* Part II.F.

### B.    Comparisons Of The Settlement Agreement To The GCCF Are Legally Irrelevant.

The Cobb Objectors also seek to invalidate the settlement agreement by arguing that—for some claimants—the GCCF process it replaced may have been more advantageous. *See* Cobb Br. 11-14. But Rule 23(e) requires that the level of compensation in a class settlement be "fair, reasonable, and adequate" as measured, *inter alia*, against the potential recovery that class members could achieve *in litigation*. *See Reed*, 703 F.2d at 172. As the district court correctly determined, "the settlement agreement provides compensation to class members that appears sufficient to make each and every class member whole for his, her, or its compensatory losses." R.19905. The Cobb Objectors cite no case holding—or even suggesting—that the fact that certain class members might have obtained additional recovery through a voluntary, *ex-*

*tra-judicial* process renders a settlement agreement invalid under Rule 23(e). To the contrary, the only case on which they rely involved "no demonstration on the record below that the settlement will benefit the class *in any way*." *Katrina Canal Breaches*, 628 F.3d at 195 (emphasis added).

The Cobb Objectors' invocation of the GCCF process is particularly inapt because that program was designed—like BP's internal claims process—to provide compensation *far broader* than what could be recovered through the legal process. As a responsible corporate citizen, and even while investigations of the facts were ongoing, BP committed promptly after the spill to pay all legitimate claims for economic loss, including those in excess of the $75 million liability cap provided by the Oil Pollution Act, 33 U.S.C. § 2704(a)(3). R.7296. The GCCF was a generous program, which reflected BP's commitment to compensating— timely and in full—those who were economically harmed by the *Deepwater Horizon* incident, and it was lauded by an independent evaluation commissioned by the Department of Justice. *See supra* at 5-6. Should this Court conclude that the settlement is unfair or otherwise unlawful, BP will continue to discharge its commitment to compensate parties truly injured by the spill. However, this Court should not discourage other companies from emulating BP's voluntary, laudable actions by holding that the only class settlement that can survive judicial scrutiny is one that is more generous, in every respect, than the GCCF.

## C.    The Gulf Coast Tourism And Gulf Seafood Fund Is Not An Impermissible *Cy Pres* Distribution.

Certain individual objectors ("Sturdivant Objectors") maintain that the settlement agreement is an impermissible *cy pres* award because the agreement created and funded the Gulf Coast Tourism and Gulf Seafood Fund, a $57 million fund to promote businesses in the tourism and seafood industries in the Gulf region. They are incorrect.

The *cy pres* doctrine is "an equitable doctrine that has been imported into the class-action context from the field of trust law." *Klier* v. *Elf Atochem N. Am., Inc.*, 658 F.3d 468, 473 (5th Cir. 2011). In the class context, this doctrine establishes the presumption that all funds in a class settlement "belong solely to the class members," meaning that, if any money remains in a settlement fund, the court must distribute that money "for a purpose as near as possible to the legitimate objectives underlying the lawsuit, the interests of class members, and the interests of those similarly situated." *Id.* at 473-74 (citation omitted). Accordingly, this Court has held that a district court may not "orde[r] a *cy pres* distribution in the teeth of the bargained-for terms of the settlement agreement, which required residual funds to be distributed within the class." *Id.* at 471.

The Gulf Coast Tourism and Gulf Seafood Fund does not run afoul of the *cy pres* doctrine. The Fund is a separate, bargained-for part of the settlement agreement, which serves to promote the businesses of

class members actually harmed by the *Deepwater Horizon* incident. The Fund did not violate "the bargained-for terms of the settlement agreement," *Klier*, 658 F.3d at 471; instead, it is part-and-parcel of that agreement. The Fund is thus analogous to the promotional fund approved by the Second Circuit in *In re Agent Orange Product Liability Litigation*, 818 F.2d 179 (2d Cir. 1987). As the Second Circuit explained there, in terms directly applicable to this case, "a district court may, in order to maximize the beneficial impact of the settlement fund on the needs of the class, set aside a portion of the settlement proceeds for programs designed to assist the class." *Id.* at 185 (citation and internal quotation marks omitted).

Nor would the Ninth Circuit's decision in *Dennis* v. *Kellogg Co.*, 697 F.3d 858 (9th Cir. 2012)—even if adopted by this Court—mandate a contrary result. In *Dennis*, the defendant agreed to establish a $2.75 million fund to compensate individual class members and to donate $5.5 million of the defendant's products to feed the indigent. *Id.* at 862-63. The Ninth Circuit invalidated the agreement because it did not specify the charities to which the defendant was to donate the $5.5 million and because there was no "driving nexus between the plaintiff class and the *cy pres* beneficiaries." *Id.* at 865 (citation omitted). The Gulf Coast Tourism and Gulf Seafood Fund, in contrast, has clear beneficiaries with a direct nexus to the settlement class. The Fund promotes the tourism and seafood industries most harmed by the *Deepwater Horizon*

incident, and does so by giving money to non-profit and governmental entities throughout the Gulf to fund such promotion. *See* R.10275 ¶ 13 ("The Class Members, which include property owners, business owners and people that work in the seafood industry in this area will benefit from these investments above and beyond payments on their claims through increased value to their properties and businesses from these investments.").

## II. If The Variable-Profit Decision Were Upheld, The Class Could Not Be Certified And The Settlement Could Not Be Approved.

Rule 23(a) and Rule 23(b) "focus court attention on whether a proposed class has *sufficient unity* so that absent members can fairly be bound by decisions of class representatives," and "[t]hat dominant concern persists when settlement, rather than trial, is proposed." *Amchem*, 521 U.S. at 621 (emphasis added). In this case, only Class Counsel sought certification before the district court. *See* R.3918; R.5087; R.15154 n.20. As the "party seeking class certification," Class Counsel "must affirmatively demonstrate [its] compliance" with Rule 23, *Wal-Mart Stores, Inc.* v. *Dukes*, 131 S. Ct. 2541, 2551 (2011), and bears the "burden of proof" on the issue of certifiability, *McManus* v. *Fleetwood Enters., Inc.*, 320 F.3d 545, 548 (5th Cir. 2003). The district court had an independent duty to confirm that Class Counsel carried this burden. *See Strong*, 137 F.3d at 849; *accord Davis* v. *Hutchins*, 321 F.3d 641,

649 (7th Cir. 2003) ("Rule 23(c) imposes an independent duty on the district court to determine by order that the requirements of Rule 23(a) are met regardless of the defendant's admissions.").

Before the district court, BP did not submit briefing on the issue of certifiability, noting that, "[a]s counsel for the party seeking final certification of the Settlement Class, Class Counsel will respond to the objections challenging . . . certifiability." R.15154. At the same time, for the limited purposes of the settlement agreement then before the court, BP explained that it "agree[d] . . . with [the] conclusion that the proposed settlement class satisfies all the requisites for class certification." R.15084 n.18.

On appeal, the objectors have raised very substantial challenges to the certifiability of the class, especially as to predominance under the Supreme Court's recent decision in *Comcast Corp.* v. *Behrend*, 133 S. Ct. 1426 (2013), which had not been decided when the district court certified the class, as well as this Court's decisions in *Bell Atlantic Corp.* v. *AT&T Corp.*, 339 F.3d 294 (5th Cir. 2003), and *Steering Committee* v. *Exxon Mobil Corp.*, 461 F.3d 598 (5th Cir. 2006). The objectors have also raised substantial adequacy challenges under the Supreme Court's decision in *Amchem*, 521 U.S. at 626-28.

Regardless of whether the settlement class could satisfy the requirements for certification as the settlement agreement was originally written, however, it has now been modified—indeed, distorted beyond

recognition—by the Variable-Profit Decision. As rewritten by Class Counsel and the district court, the settlement class contains numerous, irredeemable flaws, rendering it impossible for Class Counsel to carry their burden of demonstrating certifiability. The fundamental problem is that the Variable-Profit Decision transforms the settlement from an agreement compensating for actual lost profits into an improper and impermissible system for awarding money to claimants based upon the happenstance of how they recorded their transactions. For example, if a cash-basis business recorded disbursements for inventory purchases within its chosen Compensation Period, but recorded the revenue for the corresponding sale of that inventory outside the period, the Variable-Profit Decision would treat the business as having suffered a "loss" during the Compensation Period—even though it had simply exchanged one form of asset (cash) for another (inventory) and had not suffered any loss at all.

Under the Variable-Profit Decision, many thousands of claimants that suffered no damages have already been included in the class simply because they kept their books on a cash or other unadjusted basis and strategically selected their Compensation Period. *See supra* at 16-19. And even as to claimants that would have had *some* valid claim arising from the incident, the Variable-Profit Decision will often permit such businesses to collect awards far in excess of the harm they actually suffered. *Ibid.* Thus, two identically situated businesses, with precisely

the same financial performance, will get completely different treatment and monetary awards based solely upon the happenstance of how they recorded their business transactions.

The Variable-Profit Decision thus radically alters the class originally covered by the settlement agreement—parties harmed by the *Deepwater Horizon* incident—to a class that includes at least three different types of members: (1) those who receive recoveries based on the actual lost profits they suffered; (2) those who suffered no losses at all, but nonetheless reap sizable windfalls because they kept their monthly books on an unadjusted basis; and (3) those who did suffer lost profits, but receive exaggerated recoveries. This rewriting of the agreement urged by Class Counsel, and its consequent redefinition of the class, renders the class uncertifiable under Rule 23(a) and Rule 23(b)(3) on a number of grounds and makes the settlement unfair under Rule 23(e).

### A. The Variable-Profit Decision Renders The Named Plaintiffs Inadequate Class Representatives.

Under Rule 23(a)(4), a class may be certified only if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). To satisfy this requirement, "[a] class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Amchem*, 521 U.S. at 625-26 (quotation omitted). "[B]ecause absent class members are conclusively bound by the judgment in any class action brought on their

behalf, the court must be especially vigilant to ensure that the due process rights of all class members are safeguarded through adequate representation at all times." *Berger* v. *Compaq Computer Corp.*, 257 F.3d 475, 480 (5th Cir. 2001).   Importantly, "[t]he adequacy requirement provides *structural* protections during the process of bargaining for settlement." *Dewey* v. *Volkswagen Aktiengesellschaft*, 681 F.3d 170, 189 n.19 (3d Cir. 2012).   Thus, even if "the stars aligned and the class members' interests were not actually damaged . . . representative plaintiffs [cannot] bypass structural requirements." *Ibid.*; *accord Amchem*, 521 U.S. at 626 ("The disparity between the currently injured and exposure-only categories of plaintiffs, and the diversity within each category are not made insignificant by the District Court's finding that petitioners' assets suffice to pay claims under the settlement.").

In the present case, given the complexity of the settlement and the numerous geographic zones, compensation frameworks, and causation tests falling within them, all parties understood that different class members would receive different awards.   That necessarily raised serious concerns that "the interests of those within the single class are not aligned." *Amchem*, 521 U.S. at 626.   The district court nevertheless concluded that Class Counsel could be entrusted with representing this wide variety of claimants, possessing claims of varying strengths, because "the Settlement is crafted such that different payment levels reflect the relative value of the different claims," *see* R.19879, and

"persons with marginal or potentially worthless claims, whose presence could have complicated the settlement process, were excluded from the proposed class," R.19878.   In the district court's view, the *reason* that Class Counsel could fairly represent all class members was that each member's award was tied, by the agreement's explicit terms, to the strength of the claim that member would have if it were litigated.  And, indeed, those without claims were entirely excluded from the class.

Whatever the merits of the district court's conclusion regarding the class defined by the settlement agreement as written, the Variable-Profit Decision (unless overturned) produces a class consisting of a hodgepodge of members who suffered absolutely no harms, members entitled to compensation for harms actually suffered, and members who will now receive windfall recoveries, wholly unconnected to the minor harms that they actually suffered. *See supra* at 16-19.  This necessarily creates an intractable intraclass conflict. *See Amchem*, 521 U.S. at 625-26.  Specifically, class members with substantial injuries would want a settlement that increased compensation for actual injuries suffered; for example, in the form of higher RTP multiples of actual damages suffered.   By contrast, class members with fictitious or minimal injuries would want a settlement that calculates "compensatory" payouts in an arbitrarily generous manner, with less interest in increasing RTP multiples (which would do them no good under a rigorous test for compensatory damages, because any multiple of $0 in harm is $0).   That the

class includes a substantial number of individuals with such varying interests means that the class fails as a "structural" matter, such that the class certification must be vacated.

Class Counsel will likely respond that any conflicts are irrelevant because the settlement offers largely uncapped benefits.  But the Supreme Court in *Amchem* rejected the contention that intraclass conflicts were "made insignificant by the District Court's finding that petitioners' assets suffice to pay claims under the settlement."  521 U.S. at 626.   As the Court explained, "[a]lthough this is not a 'limited fund' case certified under Rule 23(b)(1)(B), the terms of the settlement reflect essential allocation decisions designed to confine compensation and to limit defendants' liability."  *Id.* at 626-27.  Where a class fails on a structural level, it must be vacated without regard to whether "the class members' interests were not actually damaged."  *Dewey*, 681 F.3d at 189 n.19; *accord Amchem*, 521 U.S. at 626.

The wisdom of *Amchem* is reflected by the facts in this case.  If the Variable-Profit Decision is to be accepted—and, to be clear, BP has consistently maintained that the Decision grossly perverts both the settlement's text and core purpose—the result will be that Class Counsel secured a settlement that benefits class members who suffered actual losses *and* those who suffered *no* losses.  Such an agreement would almost necessarily make injured members worse off than they might have been had non-injured members been excluded from the class.  While the

settlement provides full, uncapped compensatory damages to everyone harmed by the *Deepwater Horizon* incident (*see supra* at 8-9), it also awards *well beyond* full compensation to many class members by providing RTP payments in exchange for the release of non-compensatory recovery claims. R.19852-53. Moreover, there are different RTPs varying by Zone and by type of class member. Those RTPs were negotiated based upon the strength of claims and claimant type. Thus, if BP truly entered into a settlement agreement that requires generous payments of hundreds of millions (if not billions) of dollars to entities who suffered no harm at all, surely Class Counsel could have secured higher RTP payments for the actually injured parties alone if Counsel had been negotiating exclusively on their behalf. It is exactly this sort of class conflict that Rule 23(a)(4)'s structural protections were designed to protect against.

### B.    The Variable-Profit Decision Destroys Commonality.

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The Supreme Court recently "heightened the standards for establishing commonality." *M.D. ex rel. Stukenberg* v. *Perry*, 675 F.3d 832, 839 (5th Cir. 2012). In *Dukes*, the Court explained that commonality requires that class members' claims "depend upon a common contention" that is "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the va-

lidity of each one of the claims in one stroke." 131 S. Ct. at 2551. This Court has since acknowledged that *Dukes* abrogated this Court's prior rule that, "to satisfy commonality '[t]he interests and claims of the various plaintiffs need not be identical.'" *M.D.*, 675 F.3d at 839 (alteration in original) (quoting *Forbush* v. *J.C. Penney Co.*, 994 F.2d 1101, 1106 (5th Cir. 1993)). Instead, under *Dukes*, "[c]ommonality requires the plaintiff to demonstrate that the class members 'have suffered the *same injury*.'" *Dukes*, 131 S. Ct. at 2551 (quoting *Gen. Tel. Co. of Sw.* v. *Falcon*, 457 U.S. 147, 157 (1982)) (emphasis added).

Under the correct interpretation of the settlement, only businesses with actual losses, and thus actual claims against BP, are included within the class, although the nature of their injuries varies across the various different categories of claims (such as claims for lost salaries, subsistence claims, property damage claims, and BEL claims). Such a class could potentially satisfy the commonality requirement. But under the Variable-Profit Decision, businesses that suffered no harms from the *Deepwater Horizon* incident are transformed into class members, and thus it could not be said that all class members "suffered the same injury" if that Decision were upheld. Indeed, many members of that redefined class have suffered no injury at all. And because non-injured class members lack a claim against BP that they could assert in actual litigation, there are no questions common to all class members for which the answers "will resolve an issue that is central to the validity of

each one of the claims." *Dukes*, 131 S. Ct. at 2551; *see also Banda* v. *Corzine*, No. 07-4508, 2007 WL 3243917, at *17 (D.N.J. Nov. 1, 2007) (presence of persons who "have no claim whatsoever . . . prevent[s] fulfillment of the commonality-of-claims requirement").[2]

### C.    Under The Variable-Profit Decision, Individual Damages Issues Would Predominate Over Any Common Issues.

In damages class actions like this one, Rule 23(b)(3) requires that "the questions of law or fact common to class members predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).  The predominance inquiry is designed to "tes[t] whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem*, 521 U.S. at 623.  The inquiry is "more demanding than the commonality requirement," and "mandates caution, particularly where 'individual stakes are high and disparities among class members great.'"  *Bell Atl.*, 339 F.3d at 301-02 (quoting *Amchem*, 521 U.S. at 625).  Because Rule 23(b)(3) is an "adventuresome innovation" that is "designed for situations in which class-action treatment is not as clearly called for," courts have a "duty to take a close look at whether common

---

[2] Since "[t]he commonality and typicality requirements of Rule 23(a) tend to merge," *Falcon*, 457 U.S. at 157 n.13, the claims of the representative parties are also no longer typical of the claims of the class in light of the Variable-Profit Decision.

questions predominate over individual ones." *Comcast*, 133 S. Ct. at 1432 (citations and internal quotation marks omitted).

Prior to the Supreme Court's recent decision in *Comcast*, there was uncertainty as to whether, to satisfy the predominance requirement, a plaintiff must show that damages are measurable on a classwide basis using a common methodology. Some decisions of this Court indicated that classwide measurement was required, explaining that Rule 23(b)(3)'s requirement is not satisfied "where the calculation of damages is not susceptible to a mathematical or formulaic calculation, or where the formula by which the parties propose to calculate individual damages is clearly inadequate." *Bell Atl.*, 339 F.3d at 307; *accord Steering Comm.*, 461 F.3d at 602. Other federal courts arguably disagreed. *See Yokoyama* v. *Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010) ("In this circuit, . . . damage calculations alone cannot defeat certification.").

*Comcast* settled this division of authority, making clear that certification under Rule 23(b)(3) requires a reliable, common methodology for measuring classwide damages that is also tied to plaintiffs' theory of liability. *See* 133 S. Ct. at 1433 (holding that "a model purporting to serve as evidence of damages in this class action must measure only those damages attributable" to plaintiffs' theory of liability and that without such a model, "[plaintiffs] cannot show Rule 23(b)(3) predominance: [q]uestions of individual damage calculations will inevitably

44

overwhelm questions common to the class"). As the D.C. Circuit recently explained in *In re Rail Freight Fuel Surcharge Antitrust Litigation*, No. 12-7085, 2013 WL 4038561, at *5, 8 (D.C. Cir. Aug. 9, 2013), while "the case law was far more accommodating to class certification under Rule 23(b)(3)" before *Comcast*, "[c]ommon questions of fact cannot predominate where there exists no reliable means of proving classwide injury in fact." Accordingly, it is now clear that for Class Counsel to prove that damages are measurable on a classwide basis—and thus that common issues predominate over individual ones—Class Counsel must carry its burden of establishing *both* that its proposed measurement is a fair measure of damages *and* that the measurement is tied to each class member's theory of liability. *Comcast*, 133 S. Ct. at 1433.

In this case, it was Class Counsel's burden to establish predominance, *see supra* at 34, and the *only* measure of damages that Class Counsel proffered before the district court to defend the predominance of the class was the formula embodied in the settlement agreement, *see* R.14996 ¶ 47 n.39 (Robert H. Klonoff Supp.). The district court also relied upon only the settlement agreement's "common methodologies or formulaic calculations" to reject the objectors' damages-based arguments. R.19891. Thus, whether the class satisfies predominance rests entirely on whether the formula embodied in the settlement agreement satisfies the standards articulated in *Comcast*.

Regardless of whether that formula as originally drafted by the parties satisfies this *Comcast* standard, the Variable-Profit Decision (unless overturned) would preclude class certification because (1) that Decision renders "clearly inadequate" the settlement agreement's "formula by which the parties propose to calculate individual damages," *Bell Atl.*, 339 F.3d at 307; *Comcast*, 133 S. Ct. at 1433, and (2) that Decision sunders the connection between the class members' theory of liability and the agreement's measure of damages, *ibid*.

1. The settlement class, as modified by the Variable-Profit Decision, measures damages in a "clearly inadequate" manner that is contrary to any recognized lost-profits methodology. *Bell Atl.*, 339 F.3d at 307. As a result of that Decision, damages are determined idiosyncratically and irrationally on the basis of how business claimants opted to maintain their books and records. *See supra* at 16-19. As the Claims Administrator recognized, the Decision results in awards for certain industries, such as "attorneys, construction companies [and] farming enterprises," that "appear disproportionate when compared to award amounts for claimants in other industries." R.25159. Indeed, for claimants that present books on a cash basis, the formula "could result in a loss or a greater loss not related to the Spill but instead is a result of the timing of cash received." R.23396.

The district court acknowledged that the Variable-Profit Decision produces "absurd results," but believed that the "settlement agreement

anticipates that such results would sometimes occur." R.21003 (quotation omitted).  But even if some imprecision might sometimes be tolerated for a small number of claimants at the margins, a "formula" that routinely and systematically produces awards for parties that suffered no harm, and that results in a class that includes large numbers of uninjured people, while providing "disproportionate" and "absurd" awards for class members, cannot possibly be said to create an "adequat[e]" formula for uniformly compensating class members for the harms they suffered.  Indeed, if a mathematical formula that is not tethered closely to the strength of the class members' claims were sufficient to satisfy the predominance requirement, that requirement would be a dead letter that any class counsel could easily plead around.  That is not the law, as this Court's decision in *Bell Atlantic* confirms.

In that case, the plaintiff businesses alleged that AT&T violated the antitrust laws by "block[ing] the free passage of caller-ID data over its long-distance network."  339 F.3d at 297.  They attempted to establish that common issues would predominate by proposing a formula that utilized nationwide averages to calculate damages.  But that formula, this Court explained, failed to account for differences among class members and thus did not "represen[t] an adequate approximation of any single class member's damages, let alone a just and reasonable estimate of the damages of every class member." *Id.* at 304.  Indeed, some businesses that would have had no claim for damages would have re-

covered under the formula. *See id.* at 304-06. Given the inability of the formula to approximate damages accurately and the resulting individualized damages issues, this Court concluded that "the issue of damages defeat[ed] predominance." *Id.* at 308. The same is true here.

Nor does the fact that this is a single-incident case alter the analysis. In *Steering Committee*, this Court affirmed denial of class certification in a mass tort action arising out of a fire at a chemical plant. 461 F.3d at 600. Emphasizing that the predominance inquiry is "more rigorous than the commonality requirement," this Court rejected the argument that commonality on liability issues sufficed. *Id.* at 603. Rather, individual issues—including the need for individualized damages inquiries—rendered the class inappropriate for certification under Rule 23(b)(3). *Id.* at 603-04. Although the alleged injuries, like those present here, arose from a single accident, "the damages claims in [the] case [were] not subject to any sort of formulaic calculation." *Id.* at 602. Without an adequate framework to measure damages actually caused by the incident, the settlement class—as modified by the Variable-Profit Decision—is similarly mired in individualized damages inquiries, which predominate over any issues common to the class.

2. The settlement agreement, as misinterpreted in the Variable-Profit Decision, would also preclude class certification for a separate and independently sufficient reason: It divorces a class member's damages from its theory of liability. In *Comcast*, the Court considered

whether the plaintiffs satisfied the predominance requirement by proposing a damages model that purportedly measured damages on a classwide basis. *See* 133 S. Ct. at 1430-31. The Court held that predominance was absent because "the model failed to measure damages resulting from the particular antitrust injury on which [defendants'] liability . . . is premised." *Id.* at 1433.

Similarly here, for a claimant to prevail at trial against BP, it would have to establish that it was injured by BP and show the extent of the injury. *See, e.g.*, 33 U.S.C. § 2702(b)(2)(B) (imposing liability for "[d]amages for injury to, or economic losses resulting from destruction of, real or personal property" by oil spill). After the Variable-Profit Decision, however, the BEL framework permits a claimant to recover *millions* of dollars without suffering any injury at all, or, in the case of actual injury, to receive an award well in excess of the true amount. Thus, the settlement awards damages with no connection to many class members' causes of action, and the settlement class accordingly fails the predominance requirement. *See Comcast*, 133 S. Ct. at 1433; *see also Rail Freight*, 2013 WL 4038561, at *5 (holding that, to satisfy the predominance requirement, the class proponents must "show that they can prove, through common evidence, that all class members were in fact injured" and explaining that a damages model that "detects injury where none could exist" would "shred" the case for certification).

**D.    Under The Variable-Profit Decision, A Class Action Is Not A Superior Means Of Resolving The Disputes Arising From The *Deepwater Horizon* Incident.**

Rule 23(b)(3) permits certification only where "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  "In adding 'predominance' and 'superiority' to the qualification-for-certification list, the Advisory Committee sought to cover cases 'in which a class action would achieve economies of time, effort, and expense, *and promote uniformity of decision as to persons similarly situated*, without sacrificing procedural fairness or bringing about other undesirable results.'"  *Amchem*, 521 U.S. at 615 (emphasis added) (quoting Fed. R. Civ. P. 23 advisory committee's note, 39 F.R.D. 69, 102-03 (1966)).  Although Rule 23(b)(3) does not categorically exclude "mass accident" cases, such cases are "ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses to liability, would be present, affecting the individuals in different ways."  Fed. R. Civ. P. 23 advisory committee's note, 39 F.R.D. at 103.

Even assuming that the *Deepwater Horizon* incident has "exceptional features that warrant departing from the general rule" against certifying mass tort class actions, *Steering Comm.*, 461 F.3d at 604, the Variable-Profit Decision's redefinition of the class would make the class mechanism an *inferior* method for resolving the controversy arising out of the incident.  Under the Decision, the settlement agreement awards

wildly different awards based on nothing more than the manner in which claimants keep their financial records. While continued individualized litigation against BP would be expensive, such litigation would at least allow for the calculation of damages awards that actually correspond to the losses suffered by plaintiffs. The failure to provide for reasonably accurate individualized determinations renders the class mechanism an inferior method of resolving this case. *See id.* at 604-05 ("[T]he predominance of individual issues relating to the plaintiffs' claims for compensatory and punitive damages detracts from the superiority of the class action device in resolving these claims."); *see also Allison* v. *Citgo Petroleum Corp.*, 151 F.3d 402, 419 (5th Cir. 1998).

### E. Under The Variable-Profit Decision, The Class Definition Is Irrational And Therefore Inadequate.

Implicit in Rule 23 is the requirement that the class be "adequately defined and clearly ascertainable." *Union Asset Mgmt. Holding A.G.* v. *Dell, Inc.*, 669 F.3d 632, 639 (5th Cir. 2012) (internal quotation marks omitted). Accordingly, class membership must be "ascertainable" *and* the class definition must be "adequate[]." *Id.* To satisfy Rule 23's requirements the ascertainable class definition must, in turn, be fair and not arbitrary; instead, that definition must base class membership on a "rational demarcation." *Boca Raton Cmty. Hosp., Inc.* v. *Tenet Healthcare Corp.*, 238 F.R.D. 679, 689 (S.D. Fla. 2006), *aff'd on other grounds by* 582 F.3d 1227 (11th Cir. 2009).

In the present case, the class definition includes persons and entities whose "claims meet the descriptions of one or more of the Damage Categories described in Section 1.3." Agreement § 1 (R.6266). If the settlement agreement is interpreted as written and intended, it is impossible for someone to "meet the description" of a class member without having suffered actual damages, as demonstrated under objective criteria and based upon well-accepted accounting rules. *See supra* at 16-19. This is consistent with the type of class definition "routine[ly]" upheld by courts. *See Union Asset*, 669 F.3d at 640.

As modified by the Variable-Profit Decision, however, an entity's inclusion in the class turns on the wholly arbitrary and irrational factor of how that entity keeps its books, even if its accounting practices are at odds with accepted methods of calculating lost profits and even if the party suffered no actual lost profits. It is hard to imagine a less "rational demarcation," *Boca Raton*, 238 F.R.D. at 689, of a class than one that leads to systematic inclusion of numerous uninjured parties in the class, simply because those parties chose to apply (without any foreknowledge of the settlement) different off-the-shelf accounting methodologies that bear no connection to the subject of the underlying claims in litigation.

**F.     Under The Variable-Profit Decision, The Settlement Is Not Fair, Reasonable, And Adequate.**

Federal Rule of Civil Procedure 23(e) provides that a district court may approve only those class settlements that are "fair, reasonable, and adequate."  The purpose of Rule 23(e) is "'to protect the nonparty members of the class from unjust or unfair settlements affecting their rights.'" *Wilson* v. *Sw. Airlines, Inc.*, 880 F.2d 807, 818 (5th Cir. 1989) (quoting *Piambino* v. *Bailey*, 610 F.2d 1306, 1327 (5th Cir. 1980)).

As explained above, *see supra* at 28-30, a settlement may be approved as fair, reasonable, and adequate notwithstanding the fact that it offers different benefits to different class members.  To permit such differentiation, however, the benefits provided to class members must be based on a "fair approximation of [their] relative entitlement" to relief.  *Reed*, 703 F.2d at 175; *see also*, *e.g.*, *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 323 n.73 (3d Cir. 1998) (in evaluating fairness, courts should consider "[w]hether persons with similar claims will receive similar treatment"); *In re BankAmerica Corp. Sec. Litig.*, 210 F.R.D. 694, 712 (E.D. Mo. 2002) ("The Court finds that to be fair, reasonable and adequate, . . . the plan of allocation should reflect the strength of all of the October purchasers' claims as compared to the strength of all of the claims of other plaintiffs.").  Put another way, benefits that a settlement agreement provides class members must correspond to the strength of their claims.  In approving the

settlement here, the district court correctly recognized that, as written, the settlement agreement "ensures that similarly situated class members are treated similarly," R.19853, adding that "[i]t is perfectly fair and reasonable, and indeed common and accepted, for settlement benefits to turn on the strength of class members' claims," R.19932.

The Variable-Profit Decision destroys the very basis on which the district court approved the settlement agreement.  Under that Decision, the settlement agreement's benefits no longer turn "on the strength of class members' claims," nor are "similarly situated class members . . . treated similarly."  Instead, similarly situated class members are receiving materially different awards solely as a result of arbitrary factors—the method by which they maintain their financial records and the timing of certain transactions—that bear no relationship to the strength of their claims or the extent of their injuries.  And the disparities here are particularly problematic because the settlement agreement is now being misconstrued to award hundreds of millions (if not billions) of dollars in windfall awards to class members with *no harms* at all, or with only *minimal harms*, based upon only the happenstance of how they kept their books (and the resulting ability of cash-basis claimants to manipulate those records after the fact to inflate their claims).  The perversion of the settlement agreement accomplished by the Variable-Profit Decision thus results in the highest awards going to claimants who kept their financial records with the least precision.  In short, un-

der the Variable-Profit Decision the settlement agreement does not "fair[ly] approximat[e]" the class members' "relative entitlement" to relief. *Reed*, 703 F.2d at 175.

Nor does the fact that the settlement agreement provides largely uncapped benefits and full compensatory damages undermine this conclusion. BP's interest in entering the class settlement was to reach agreement with those parties harmed by the *Deepwater Horizon* incident, in order to provide compensation to those parties and to forestall further litigation from parties with allegedly valid claims. If the Variable-Profit Decision were correct, however, then BP paid Class Counsel ransom in the form of awards totaling hundreds of millions (if not billions) of dollars to parties that suffered absolutely no compensable harm at all, and thus had no possible claims against BP. As explained above, *see supra* at 39, if BP really did agree to pay this large sum of money to uninjured parties—and it did not—it would be wholly irrational to conclude that BP would not have, just as readily, agreed to devote that same sum to paying actually injured parties instead, in the form of higher RTP payments. It would contravene the purpose of Rule 23(e) to approve a class settlement that devotes hundreds of millions (if not billions) of dollars to irrelevant, uninjured parties.

**G. Principles Of Constitutional Avoidance Support The Conclusion That The Variable-Profit Decision Renders The Class Uncertifiable.**

Rule 23 "must be interpreted in keeping with Article III constraints." *Amchem*, 521 U.S. at 613. Consistent with this principle, courts have regularly held that "for a class to be certified, each member must have standing and show an injury in fact that is traceable to the defendant and likely to be redressed in a favorable decision." *Halvorson* v. *Auto-Owners Ins. Co.*, 718 F.3d 773, 778 (8th Cir. 2013); *accord Denney* v. *Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006) ("[N]o class may be certified that contains members lacking Article III standing.").

At the time that it certified the settlement class, the district court found that the class "consist[ed] *exclusively* of individuals and businesses that have already suffered economic loss and property damage." R.19876 (emphasis added). That is, as originally (and properly) interpreted, the settlement agreement applied only to parties who had suffered constitutional "injury in fact." *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 563 (1992). Under the Variable-Profit Decision, however, claimants who suffered no harm—and thus no Article III injury—are improperly shoehorned into the class. *See supra* at 16-19. If the Variable-Profit Decision were upheld, certification of the resulting class (which would include a substantial number of members who suffered no constitutional injury) would create a conflict between Rule 23 and Article III, in direct contravention of the Supreme Court's instruction that

Rule 23 "must be interpreted in keeping with Article III constraints." *Amchem*, 521 U.S. at 613.[3]

The settlement class, as misinterpreted by the Variable-Profit Decision, also cannot be certified without creating serious constitutional problems as related to Article III's requirement that "there must be a causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560. During oral argument in the appeal from the Variable-Profit Decision, Judge Clement highlighted this problem as one of "causation and consideration," asking, "where is BP's consideration for agreeing to pay those claims without proving they were caused by the oil spill?" *See* Oral Argument at 06:34, No. 13-30315, *available at* http://www.ca5.uscourts.gov/OralArgRecordings/13/13-30315_7-8-2013.wma. Parties that have suffered no harms at all—or only minimal harms—plainly cannot show that their settlement awards have a

---

[3] *Mims* v. *Stewart Title Guaranty Co.*, 590 F.3d 298 (5th Cir. 2009), is not to the contrary. In *Mims*, this Court merely held the district court did not abuse its discretion where the defendant speculated that "the class as defined *may* include plaintiffs who are not in fact eligible for the discount," by looking to the defendant's own criteria as to which customers were eligible for the unlawfully withheld discount. 590 F.3d at 307-08 (emphasis added). *Mims* did not address the question whether Rule 23 should be read to avoid Article III concerns that arise from the certification of a class that demonstrably includes a substantial number of class members that have suffered no constitutional injury.

"causal connection" to the *Deepwater Horizon* incident.  A holding by this Court that the class is certifiable notwithstanding such Article III causation problems would create serious constitutional concerns for Rule 23.[4]

### H.    If Upheld, The Variable-Profit Decision Would Render The Class Notice Misleading And Impermissible.

Where parties seek certification of a settlement class pursuant to Rule 23(b)(3) and approval of a settlement pursuant to Rule 23(e), notice of the class settlement must satisfy the requirements of both Rule 23(c)(2)(B) and Rule 23(e)(1).  Rule 23(c)(2)(B) provides seven items that a notice must include for a class certified under Rule 23(b)(3).  Of particular relevance here, the notice must state "the definition of the class certified."  Fed. R. Civ. P. 23(c)(2)(B)(ii); *see also* 3 Alba Conte *et al.*, *Newberg on Class Actions* § 8:31 (4th ed. 2002) ("Notice of the certification order and the *precise definition* of the class are most important for

---

[4]  The problem that Judge Clement identified has been exacerbated by the Claims Administrator's policy—affirmed by the district court—of awarding compensation "for all losses payable under the terms of the Economic Loss frameworks in the Settlement Agreement, *without regard to whether such losses resulted or may have resulted from a cause other than the Deepwater Horizon oil spill* provided such claimants have satisfied the specific causation requirements set out in the Settlement Agreement."  R.22171-72 (emphasis added), *aff'd by* D.E. 9202.  BP takes no position on the relevance *vel non* of this issue if the Variable-Profit Decision is overturned, as it should be.

decisions by absent members." (emphasis added)). And when a class settlement is proposed, Rule 23(e)(1) requires that the court "direct notice in a reasonable manner to all class members who would be bound by the proposal."

In this case, the class notice did not indicate that the class would include businesses that had suffered no economic losses. Indeed, the notice said quite the opposite: "The Economic and Property Damages ('E&PD') Settlement Class includes people, businesses, other entities, and properties in the states of Louisiana, Alabama and Mississippi, and certain counties in Texas and Florida, that were *harmed* by the oil spill." *E.g.*, R.1937 (emphasis added). Nor were class members notified that the Settlement Program would mechanically accept handpicked claimant financial records without applying any scrutiny based on economic and accounting analysis. To the contrary, the parties submitted, and the district court found, that the compensation methodology was "derived from recognized and accepted methodologies applied in evaluating business economic loss claims." R.19855. The Variable-Profit Decision fundamentally altered, *sub silentio*, the composition of the class and the settlement agreement. It thus violates the settled rule that class members must be notified about matters that affect significant rights. *See*, *e.g.*, *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1103-06 (5th Cir. 1977) (rule requires the notice to "contain information that a reasonable person would consider to be material in

making an informed, intelligent decision of whether to opt out or remain a member of the class and be bound by the final judgment," *id.* at 1105); *Johnson* v. *Gen. Motors Corp.*, 598 F.2d 432, 437 (5th Cir. 1979).

This deficient notice prejudiced class members. For example, those entities that suffered harm and are thus properly within the class likely understood, based on the notice provided, that only other injured entities were within the class. But had they known that the class included non-injured entities, they may have questioned whether the settlement agreement was the best outcome they could achieve. Injured claimants with knowledge of the Variable-Profit Decision may have therefore concluded that they could obtain a greater award—or larger settlement—by proceeding against BP outside of this class action. But because the opt-out period ended on November 1, 2012, R.11214—well before the Variable-Profit Decision—these injured claimants must remain within the class and are bound by the settlement.

## CONCLUSION

If the Variable-Profit Decision is overturned, this Court should uphold the fairness and adequacy of the settlement agreement. If the Variable-Profit Decision were to be affirmed, however, the district court's decision certifying the settlement class and approving the settlement would have to be reversed.

August 30, 2013

Respectfully submitted,

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Wendy L. Bloom
Andrew B. Bloomer, P.C.
R. Chris Heck
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL  60654
(312) 862-2000

Jeffrey Bossert Clark
Steven A. Myers
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C.  20005
(202) 879-5000

Daniel A. Cantor
Andrew T. Karron
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C.  20004
(202) 942-5000

Jeffrey Lennard
DENTONS LLP
233 South Wacker Drive
Suite 7800
Chicago, IL  60606
(312) 876-8000

  /s/ Theodore B. Olson
Theodore B. Olson
   *Counsel of Record*
Miguel A. Estrada
Thomas G. Hungar
Scott P. Martin
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500

George H. Brown
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA  94304
(650) 849-5300

S. Gene Fendler
Don K. Haycraft
R. Keith Jarrett
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, LA  70139
(504) 581-7979

*Counsel for Defendants-Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that on August 30, 2013, an electronic copy of the foregoing Brief for Appellees was filed with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system, and that service will be accomplished by the appellate CM/ECF system.


   /s/ Theodore B. Olson

Theodore B. Olson
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500

`

## CERTIFICATE OF COMPLIANCE WITH
## TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS,
## AND TYPE STYLE REQUIREMENTS

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 13,759 words, as determined by the word-count function of Microsoft Word 2010, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Fifth Circuit Rule 32.2.

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point New Century Schoolbook LT font.


   /s/ Theodore B. Olson
Theodore B. Olson
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500

**CERTIFICATE OF ELECTRONIC COMPLIANCE**

I hereby certify that on August 30, 2013, this Brief for Appellees was transmitted to the Clerk of the United States Court of Appeals for the Fifth Circuit through the Court's CM/ECF document filing system, https://ecf.ca5.uscourts.gov.  I further certify that: (1) required privacy redactions have been made pursuant to this Court's Rule 25.2.13, (2) the electronic submission is an exact copy of the paper document pursuant to this Court's Rule 25.2.1, and (3) the document has been scanned with the most recent version of Microsoft Forefront Endpoint Protection and is free of viruses.


   /s/ Theodore B. Olson
Theodore B. Olson
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500